We have six cases on the calendar this morning. Three patent cases, one trade case, and two government employee cases. The government employee cases and one of the patent cases will not be argued to being submitted on the briefs. The first case is TESSERA v. ITC and Alpita et al., 2010-1176. Mr. Heffernan. Good morning, Your Honors. Ben Hattenbeck for TESSERA. This case, Your Honor, has, with the expiration of the two DeStefano-Condros patents, been narrowed to a single patent with respect to which there are two issues, both of which are issues of law. The first issue is an issue of claim construction. The question is, how should the term in the claim's top layer be construed? And the ITC initially construed that claim in a way with which we agreed, and they applied it to one of the… Is the solder mask here a protective barrier? The solder mask in the accused products is a protective barrier. It is, Your Honor, and that's our reading of the claims, a reading that they didn't reach in their analysis. So what do we have here? Two protective barriers? The second mold test and the solder mask are both serving as protective barriers? I apologize, Your Honor. If you're talking about the protective barrier of the claim… No, the solder mask is not the protective barrier of the… It does serve a protective function. It masks the top layer of the laminate so that solder doesn't spread across the entire surface. But I apologize. It's not a protective barrier. It's not the element of the accused product that we're mapping to the protective barrier element of the claim. In fact, the solder mask together with the second mold chase together provide a protective barrier against the encapsulant, right? Well… In the accused product. In our mapping of the… In the WBGA product, yeah. Yeah, in the WBGA product, in our mapping of the claim, it's actually the second mold chase that serves the function of the protective barrier of the claim. It's the solder mask layer which serves the purpose of the top layer in the claim. And that's how we're mapping them, and so it's certainly not a circumstance, and I want to be absolutely clear about this, where we're taking two claim elements, protective barrier and top layer, and mapping it to one physical structure in the accused product. We're not doing that at all. We're mapping one element of the claim to one element in the accused product, and a second element of the claim to a second and different element in the accused product. Well, suppose we were to say that both the solder mask and the second mold chase were protective barriers within the meaning of the claim. Where do we come out of that? Well, I think that that would be… If that's one reading of the claim, you would… I haven't actually thought about that, Your Honor. I think the reality here is that the top layer… Why don't you think about it for a minute? I will do so, Your Honor. If you map both of those elements to the protective barrier, then I suppose you would have to also map the solder mask layer to the top layer in at least our first reading of the claim, and if you felt that that was inappropriate, then on the first reading of the claim, you could conclude that there was an infringement. There's still our second reading of the claim, and I suppose… You didn't raise that issue, right? You never argued that the solder mask was a protective barrier within the median. We did not, Your Honor. We did not. And that's one of the reasons why we think what the ITC did in looking at its belief about how the claim should be applied to the accused products and not looking at what we were claiming in the case was inappropriate. It's almost as though, to give an analogy, it's like a case where you have an argument for indirect infringement based both on contributory and inducement, and they only look at contributory. You're talking now mostly about the WBGAs, right? That is correct, Your Honor. They're not most of them covered by the exhaustion decision? No, they're not, Your Honor. In the case of Elpida, Elpida claims that all of their products come from licensed suppliers. In the case of all of the other respondents, exhaustion is not a doctrine which would be dispositive of the case, and in fact, what the ALJ said in his initial determination is, because of that, the exhaustion doctrine as to everyone but Elpida fails. Those were his words. But we believe the exhaustion doctrine fails for- And that's not challenged on appeal. The other accused infringers are not claiming that they're licensed, right? At least they're not licensed for everything. Licensed for everything. That's correct, Your Honor. I think they claim that they're licensed for part of it, and one of the reasons why it's essential to have a ruling on the exhaustion doctrine, it's not just because of Elpida, but because with respect to those other parties, we need to be able to determine what portion of what they're trying to import is actually licensed or exhausted and which portion isn't. One of your principal arguments against the exhaustion holding is the exclusion from license provision where it states that licensing is only licensed for products where royalties are paid. Correct. And I gather that argument is made with a straight face, because if you look over the rest of the agreement, it's clear that you don't know when royalties are due until after a quarterly period has concluded when there are reports of sales. And if this sentence you're referring to simply deals with a paragraph where other products can be brought into the license and royalties then paid. So the provision you're referring to, the exclusion from license provision, we think does quite clearly articulate that there is no license until royalties are paid. It's consistent with the license grant itself. The license precedes the sales after which royalties are paid. That's basic. That's what's in this license agreement. It's in almost every license agreement. Your Honor, we respectfully disagree. The actual words of the license grant are- Your Honor, you're authorized to make the sale and then you have to make the payment, right? That's the way it works. Isn't that correct? It is not correct. Your Honor, with respect, the language of the license grant itself begins with the words subject to- No, no, no. I'm talking about the practical operation of this. These people, the licensees, the people who sign these license agreements, they can make a sale of a chip and then they pay the license fee later on. I understand there's a lump sum earlier. Forget about that. But the continuing royalty is paid after the sale takes place, right? That's how it occurs sometimes. It's not how it has to occur under the license agreement. We give our licensees who are in good standing the benefit of that flexibility. It's something that TESRA is not required to do under the plain terms of the agreement. It's something we do in order to perpetuate good relations with the licensees. How would the licensee's customers ever know whether they were engaged in an infringing act or not? They can simply ask the licensee, have you paid royalties or are you planning to pay royalties on what's required under the agreement? And if the answer to that is yes, that's the end of the inquiry. As for the chaos and the practical problems that the ITC raises, there's a very simple solution, and it's a solution they use in virtually every case. It's a simple certification. It can be as simple as checking a box that either royalties have been or will timely be paid on the products. That's your problem. Will be paid. In other words, you can make the sale without paying the royalties in advance. I can understand if you said you can't have a license unless you pay in advance, and there may be license agreements like that, and under those circumstances, maybe you don't have a license until you pay the royalties. But where you are authorized to make the sale and make the payment later, I don't understand how the failure to make the payment can suddenly go back and render the sale unauthorized. That's my problem. And in our view, the problem is resolved by the language of the agreement, which says, subject to the payment of royalties, you have a license to make the sale. It's expressly subject to the payment of royalties that they're given the right to make the sale. Yes. Subject to payment of royalties after the sale. But it doesn't say that. That's the only report. Your Honor, that may have been a possible way to write the agreement, and we don't dispute. In fact, our adversaries have plenty of cases where- Let's not beat that to death. Okay. How about the micro-BGAs? Aren't they covered by exhaustion? No, because the micro-BGAs are only made by Alpida, and if this panel concludes that exhaustion applies whenever Tessera has a license, irrespective of the terms of the license, yes, they would be covered. But it's our position, for many reasons based on many elements of the agreement, that there is no exhaustion. And by the way, this whole argument about it would be impractical to have an agreement under which you grant a license only after royalties would be paid. What the bull is down to is an implied license argument, because it's certainly not what the- This makes no sense to me. I mean, when they make the sale, they're authorized to make the sale, and you say, well, they can pay the royalties later, but if they don't pay the royalties, it comes back and suddenly the sale is voided. Right? I mean, that's your theory. No, Your Honor, the theory is not that the sale would be voided. The theory would be if they made the sale in the United States- It becomes an unlicensed sale. What was originally a licensed sale becomes an unlicensed sale because of something that happens after the sale takes place. Right? No, Your Honor. Our position would be that sale was not licensed until a royalty was paid. But it was authorized. That's not our position. That's not how we read the language of the agreement. It says- The agreement's perfectly fine. Your licensees can make the sales and pay later. So the sale at the time it took place was authorized, right? No, it doesn't say it's authorized. I think- It has to be under the agreement. There's nothing wrong with making the sale and making the payment later. So when the sale was made, it was an authorized sale. No? No. That's not our reading of the agreement. It says subject to the payment of royalties, you can make the sale. Our reading of that is- On the exhaustion issue, why wasn't that issue appropriate for appeal when the ALJ made the ruling with respect to Alpeda? In other words, why isn't that issue final on the date of the ALJ's opinion with respect to Alpeda? Well, there are a variety of reasons. I'm running out of time here, so I should probably sit down shortly. But 119 CFR 410.42H2, the provision says that an initial determination becomes a final determination unless the commission ordered review of the initial determination or certain issues therein. And they did that. They ordered review of plenty of issues therein, including issues directly linked to exhaustion, such as infringement. Exhaustion is a defense to infringement. And exhaustion, for that reason, we certainly understood and the ITC staff understood. It was still an issue, and we briefed it before the commission. I mean, with respect to Alpeda, at the point of the- I guess when the commission decided not to review the exhaustion issue, at that point, you were not going to get relief from the ITC against Alpeda. That was not our understanding, Your Honor. In fact, the microBGA products about which Judge Lurie asked a moment ago were still in the case, and Alpeda was the sole importer of those products. You continued to participate in the ITC proceeding after the decision not to review the exhaustion issue took place, right? Well, yes, although we didn't understand there to have been a decision that exhaustion wouldn't have been reviewed. It didn't state that. It didn't say that. Okay. After the decision not to review part of the ALJ's decision, you continued to participate on the invalidity issue and on the infringement issue with respect to both the U and the W chips, right? Absolutely, and as to exhaustion as well. And, in fact, the ITC even- I don't understand that. The ITC reviewed and, in fact, reversed the ALJ's decision about infringement as to the microBGA products. If Alpeda wasn't in the- They reviewed the exhaustion issue, didn't they? They ended up affirming the ALJ on exhaustion. They did. Or they resolved it with respect to Alpeda. In the final determination. But the notion that Alpeda was not in the case as of the initial determination is belied by the fact that Alpeda was the sole party associated with microBGA products, and the issue of infringement as to those products was reviewed, and not only reviewed, but reversed by the commission on appeal to the commission. There had been no reason to do that had Alpeda still been in the case. I'm going to reserve my remaining time. We'll give you your full five minutes. Thank you, Your Honors. Mr. Hughes, for the commission, and you're going to take eight minutes. Yes, Your Honor. Good morning, and may it please the Court. With respect to jurisdiction, when the commission adopted the ALJ's finding that the respondent satisfied their burden of proven patent exhaustion, that terminated the investigation with respect to those products. And it also terminated the investigation with respect to Alpeda. At that point, Tessera, the party, adversely affected- The commission that could have affected the infringement issue with respect to the Alpeda product, right? Your Honor, but nothing would have affected the product purchased from Tessera's licensees as of that date. Suppose the commission had decided the patents were invalid, and the whole exhaustion issue would have been moved, right? No, it wouldn't have been moved. At the point the commission made its determination that respondents proved their exhaustion defense, products purchased from licensees were no longer part of the investigation. That part of the investigation was over. Let's take it haphazardly. Suppose there's an exhaustion determination which is not reviewed by the commission, and the commission decides to review the validity issue, right? Yes. Okay. The validity issue, if decided against the patentee, could entirely move the exhaustion issue under those circumstances. If the patent's invalid, who cares whether there was exhaustion, right? Right. The point is both of these are defenses to patent infringement. Exactly. And they're interrelated. And why would you want somebody to appeal an issue to us that could be mooted later on by a later decision by the commission on another issue, such as invalidity or non-infringement or claim construction or whatever? Why should there be piecemeal appeal on an issue which may not even matter at the end of the road? Your Honor, it's not piecemeal appeal. The statute requires appeals of commission final determination. Why is there piecemeal appeal if other issues could affect the infringement determination with respect to Al-Qaeda? The commission believes it's an issue of final determination. That's what the statute calls for. Once the commission reaches a final determination, the adverse party has to appeal within 60 days. And this is consistent with the Court's precedent in the Amgen case. Why not just final determination if there are other issues still being litigated which could affect the result? In Amgen, the Court explained and defined a final determination and said it was a determination on the merit either to exclude or not to exclude products from entry. When the commission adopted ALJ's finding, that was a final determination not to exclude products purchased from licensees from entry. So consistent with the Court's precedent, it was a final determination on the merit. And this is also consistent with the Court's decision in Broadcom where the Court explained that it depends on whether administrative proceedings have ceased. But there was continuing participation by Al-Qaeda and there was continuing review of validity issues and infringement issues that related to or affected Al-Qaeda in some respects, correct? With respect to Al-Qaeda, Al-Qaeda understood the commission's finding because Al-Qaeda responded to the commission's- Did you answer the judge's question, yes? No, the answer is a yes and a no. It's a yes and a no because what Al-Qaeda did was Al-Qaeda explained, and we have it right here, it's JA-2771. Al-Qaeda explained that the only reason they were remaining in the investigation was to conserve what they had for appeal. They understood that that determination eliminated and terminated them from the investigation. On the merits, the manner in which TESRA interprets its contract is, in the commission's view, absurd. The issue with exhaustion is whether, at the point of sale, the products were authorized. And there's no dispute that at the point of sale, the TESRA authorizes licensees to sell at the point of sale. There's no dispute that TESRA actually holds these licensees out on its website as licensees in good standing. But exhaustion doesn't apply to all of the W's, does it? It applies to the product that are purchased from licensees. But the ALJ found in the commission adopted ALJ's finding that not all the products were purchased from licensees. So it doesn't affect all the WBGA products. And so what's the position on those that aren't covered by exhaustion? That there's no patent infringement. Why? Because the ALJ found in the commission adopted part of the ALJ's finding that the substrate core represents the top layer and not the solder mask. And based on that finding, the protective barrier, which is the second mold chase, does not come into contact with the top layer. So there is no infringement for any of the products. Is the solder mask performing in part the function of a protective barrier in the accused product? The commission didn't make that specific finding. However, TESRA in its brief explains what the solder mask is doing. And what TESRA says is that the solder mask keeps the solder away from the terminals. I think that's the explanation they have in their brief on page 21. The commission didn't make that finding because the commission didn't have to. For TESRA to win on infringement, TESRA had to prove that the solder mask was the claimed top layer. And what the commission said, it wasn't the top layer because it's treated in the specification as being separate from the top layer and is providing a protective barrier. That is right. I mean, the commission said that it appears to provide a protective barrier. But the commission didn't make that specific finding. Essentially, the commission suggested what it could be. But the commission also made sure to emphasize that it was not the claimed top layer. Because the parties below and the commission agreed that the second mold chase is the claimed top layer. So for the solder mask to be the claimed protective barrier, we don't have anything in the record that suggests that. Are all the micros covered by the exhaustion item? Yes, Your Honor. All the micros are covered. Because all of them were purchased by Elpida. And the commission found that Elpida satisfied its patent exhaustion defense. With respect to exhaustion, briefly, what is your reaction to the meaning of this regulation 210.42H2? Neither the court nor the commission has construed that language in the way TESRA does. How the commission relies on the court's precedent has construed that is if the commission decides to review in part, the issues the commission decides to review are those issues that still remain in the investigation. The issues the commission decides not to review become the final determination of the commission. So as of that date, some issues become the final determination. Other issues remain in the investigation. And this is consistent with the court's precedent in Amgen where the court explained what the final determination is. Of course, you agreed, the three of you, to split up the time. Right. Since you're opposed to it, any final thoughts on the commission's position? Yes, my final thought is for TESRA to win, TESRA has to convince the court that the substantiated evidence does not support the commission's finding that the substrate core is the top layer. TESRA also has to convince the court that the cider mask is the claimed top layer. Despite the evidence in the record that the cider mask is not the claimed top layer and the evidence in the record that the laminate substrate core is the claimed top layer. See, my time is up. Thank you. Thank you, Mr. King. Mr. Weisenberg, you represent ACER? Yes, Your Honor. I represent the ANP respondents. Right. And I'd like to pick up on the issue of infringement as that is the primary issue for those respondents. And if I leave this court with any single point, I want to make this point crystal clear, and that is the 106 patent is a method patent. And yet the keystone of TESRA's argument in both its opening brief and the reply brief is a structural comparison between the 265 patent, a piece of prior art, and the accused devices, which tells us nothing about the method which they are accusing these devices infringe. And this becomes particularly poignant when you look at the prosecution history of the 106. And this is around page 1275. The examiner did exactly the same thing. The examiner said, we're going to say the 106 patent is not going to be allowed because of the 265. Aren't there corresponding structures? TESRA's response was, corresponding structures don't matter. We're going to amend the claims to add this critical limitation, providing a protective barrier in contact with the top layer. Based upon that revision to the claim language, the 106, a method patent with all method claims, was allowed. And yet now in the briefs, in fact in the reply brief, the only images you see are from the 265 patent, a patent not asserted here. So isn't the solder mask in your product a protective barrier? It is not, Your Honor. No? What is it doing if it's not serving as a protective barrier? It does precisely what TESRA has argued throughout it does. It provides a shield to allow solder to be applied in certain areas and solder not to be applied in other areas. It does not serve the function... No, I mean solder. It does not protect the terminals from encapsulant. There's a huge hole in the center of the solder mask of the accused device. It cannot serve that role. And TESRA never takes that position. And because of that, there's no finding on it. But they do take the position that the solder mask is a generic phenomenon. And as Mr. Hughes pointed out, page 21 of their brief, and there's other material in the appendix that supports this, is that which controls where the solder goes, not the encapsulant. That's the encapsulant barrier that does that. So the solder mask is not the protective barrier in the accused device. TESRA doesn't even take that position. TESRA has argued throughout that the top layer is that which carries the terminals. And the ALJ found that in the accused device, it's the substrate core that carries the terminals. The Commission agreed with that. The Commission did look at the 106 patent, but it merely looked at it and saw that there was corroborative support in the 106 patent, that there's a distinction between a solder mask and a top layer. They didn't change or claim construction at all. And yet now in their briefing, TESRA wants this court to ignore the very construction of top layer it argued for, carries the terminal. It wants top layer to include not only that which carries the terminal, which has been found to be the substrate core, and that's supported by substantial evidence, but anything that's adjacent to it, in contact with it, near it, that could be a completely unbounded definition of that claim term, including any layer above or any layer below, which would be completely unsupportable. And in fact, what they're... Does the figure 7 show a situation where the terminals are being carried by a layer, which is a composite layer as part of the top layer? No. Figure 7 shows both terminals on the top of the top layer and on the bottom of the top layer. Now there's some dispute as to what was disavowed. If it's on the bottom of the top layer and encapsulant covers it, we don't care because there's no protective barrier. There seem to be, do they not, two layers which are bonded together to form the top layer in figure 7, and the terminals in that example are being carried by the bottom of those two layers, no? There is an example where it's carried by the bottom of the top layer, but that cannot end the inquiry. Whether or not there's a terminal on the bottom of the top layer doesn't answer the question of infringement, because the position Tessera has always taken, both as to figure 3 and figure 7 in the 265, is if it's on the top or on the bottom, there's still no protective barrier. They specifically say the 265 does not deal with protective barriers and encapsulate. So there's no figure in the 265 that reveals anything about the method of the 106. That's why the repeated deployment of that figure... So, I'm out of time, Your Honor. Thank you. The next juror, Mr. Carlson, represents El Pida. Good morning, Your Honors. I'd like to make a few points specific to my client, El Pida. First, as my colleagues have said, El Pida is in the unique position in this case of being the only respondent for which there is complete exhaustion because it purchased all of the accused products, accused of infringing the 106 patent, from licensed packagers. Now, Tessera takes the position in its briefs that there were a couple of packagers which were not licensed. What they failed to tell the court is that those two packagers only sold products which are accused of infringing the 627 and the 977 patents, which are no longer involved in this case, not part of this appeal. If you look at the 106 patent specifically, all of the products packaged by El Pida's packagers for that patent were purchased from licensed packagers. A second point, Your Honor, is that complete exhaustion applies to El Pida in this case because the record shows that Tessera received royalty payments for all of El Pida's accused products. These payments are in the record and Tessera never disputed receipt of those payments. Third, Your Honor, Your Honor's accepting Tessera's argument that the licenses of El Pida's packagers were conditioned on payment of royalties means that none of them would ever be licensees in good standing. This goes back to the points that Your Honors were making earlier because they would always have unlicensed product in the market. Mr. Croson, with respect to the 977 and 627 patents which have already expired, are they involved in any other litigation, any district court litigation? They would be involved in the, there was a companion Texas case that was stayed and they would be involved in that case because of the possibility of past damages. But they are not involved in this case because the ITC would be limited to an exclusion order for future exclusion of product. So if we were to vacate the decision of the ITC with respect to those patents, it would have an impact in that litigation? Aye, yes, Your Honor. Well, no, that's not the right answer because if I understand correctly, ITC determinations don't have any race judicata or platilus documents back in the district court. That's right here. Not binding, but it- It wouldn't be binding, but it could be considered by the court. It could be introduced and considered by the court. Yes, Your Honor. To that extent, it may have some impact. Yes, Your Honor. Is there, are there parties taking a position as to whether a vacature would be proper or not proper in this case? There has been no position taken on that, Your Honor. One thing we can say about the principle of exhaustion is it applies to your time. Thank you, Your Honor. Mr. Hamdrak, before you speak, I should have asked earlier, we have a confidential label on these briefs. What do you wish us not to state in a written opinion? I don't know which of you was asking for the confidentiality. We don't like to be precluded from explaining ourselves. I think there's some sensitivity about the detailed terms of Tessera's license agreements. You're talking about monetary terms, royalty? Primarily monetary terms. All right. There's no question that all the parties here made excessive designations of confidentiality, which go way beyond that. I think in some cases, Your Honors, there was discovery of third parties, and so we probably erred on the side of caution when those third parties had designated large swaths of materials as confidential. When the situation changes, it might help to notify the court. Proceed with your rebuttal time. Thank you, Your Honors. The very last question was about a vacature and whether a position had been taken. The answer from counsel was no, a position had not been taken. In fact, a position has been taken. It's Tessera's position that a vacature and a remand with instructions to dismiss that part of the complaint that pertains to the DeStefano-Condros patents only would be appropriate. It's in our briefs. We cited the Texas Instruments v. ITC case for that proposition, where this court indicated that was the appropriate procedural disposition for a case in that situation. Is there an interesting question under Munsing where there's no race judicata or collateral establishment effect in future cases as to whether a vacature is necessary? That's a fair point, and it is an interesting question, but we would appreciate the vacature, and we've asked for it in our briefs, and we'll renew that request now. We didn't want to waste this panel's time, obviously, debating issues that are... So there was an argument made by Mr. Croson that Figure 7 of the 265 patent is irrelevant. We disagree. It's relevant for certain purposes, and in particular, it discloses an embodiment where the terminals are on the bottom side of the top layer, and it specifically describes that embodiment as having terminals there on the top layer. It's directly responsive to arguments that the appellees have made that terminals cannot be there on the top layer when they're on the bottom side of the top layer, that they need to be on the top side of the top layer. It's a claim construction argument that occurred below and on which Tessera prevailed in front of the commission. With respect to the prosecution history argument where the 265 was differentiated, this is dealt with in our briefs, but the argument there was not that there wasn't a top layer. It was that there wasn't a top layer with exposed terminals at the time of encapsulation. That's the point of this invention, and when you look at something other than a close-cropped version of the prosecution history, in fact, the sentences immediately following what's close-cropped in the respondent's briefs, it explains exactly that. I think it's self-evident, and the commission agreed and explained why they agreed. With respect to Judge Dyke, you asked me to think about a particular infringement scenario and application of the claims, and I've had a minute to do that. The reason why you caught me off guard is because it was reading the claims that I think, as we all agree, wasn't proposed by anyone below. There weren't any findings made on it. It's certainly not how the commission has mapped the claims onto the microBGA products, and although microBGA infringement isn't technically before this court, it is of note that when they mapped the claims onto the microBGA embodiment, which is structurally analogous, that's not how the commission did it, and I think Mr. Hughes said in his argument, this is a quote, the parties and the commission below agreed that the mold chase was a protective barrier, and that's how we've all been proceeding. And so I think it's an interesting question, but one that there's no findings of fact on and that none of us had considered before, and we don't think it would be appropriate for the court to make that kind of a factual determination. That's applying the claims as opposed to determining the scope of the claims. If the court wanted to have such a thing considered, it would probably be appropriate to remand. And finally on the exhaustion issue, we heard quite a bit about that, and what I want to emphasize is that it really is a, we're on a very slippery slope here, and the ALJ has headed quite a ways down it by saying we're not going to give the ordinary meaning or the plain meaning to the part of the contract that says there is no license unless there's payment, but it really goes quite a bit beyond that, and although it's discussed in our brief, there are things we haven't heard about today, like the CHIPMAS agreement. Alpida receives products from CHIPMAS in my understanding, and CHIPMAS has a contract with Tessera. So should that result in an exhaustion as to those products if CHIPMAS makes them? We think not, and here are the facts. CHIPMAS has had a contract since 1999. How much in royalties have they paid over that period of time? Not one cent, not a cent, but it doesn't end there. CHIPMAS' agreement has a field of use restriction in the license grant. There are two kinds of products in this world at this point. There are products, there are packages that have a laminate substrate, and there are packages that have a tape substrate. They're different animals. CHIPMAS' license agreement has a field of use limited to tape substrate packages. The ALJ ignored that and found that sales by CHIPMAS of laminate substrate packages resulted in exhaustion as to these defendants. So we're not just talking about the terms of when there's an authorized sale and when there's not an authorized sale based on payment of royalties. We're talking about field of use provisions, and if we're going to go that far, why stop there? Why not just disregard everything between the title of the agreement and the signature line? It sets a very dangerous precedent, and we hope the court won't head in that direction. Thank you, Mr. Hattenbeck. Thank you, Your Honors. We'll take the case under review.